## HOOT, ET AL. V. SORRELL, ET AL.

1. The right of dower depending upon the wife's surviving the husband, may be gratuitously renounced in favor of her husband, or she may require something to be paid for it, or property to be conveyed to her separate use, as an inducement to her relinquishment.

2. Where the wife, as an inducement to relinquish her contingent right of dower, stipulates for the settlement of personal property to her separate use, which is worth half as much as the lands are sold for, the transaction will not be adjudged void, in the absence of proof implicating the wife in a want of good faith, merely because the property settled is of greater value than the consideration given for the settlement.

3. The profits derived by the wife from her separate estate are her property, and may be disposed of, or invested by her as she pleases; and property which she acquires by purchase with her income, is not subject to the payment of his debts; especially if she has not allowed it to go into his hands, or be subject to his control.

4. Where the the husband furnishes lumber, which the wife voluntarily allows to be used in erecting buildings on her separate estate, if the husband is in embarrassed circumstances at the time, this will be considered a gift to the wife in fraud of his creditors, and the latter may thus far make the wife's estate liable to pay their demands.

5. If the husband merely expends his personal labor in the improvement of his wife's estate, the estate is not thereby made a debtor to the husband, nor can the creditors of the latter charge it with the value of the labor.

6. Upon a bill by the creditors of the husband to charge the wife's estate (among other things,) with the value of lumber furnished by the husband towards its improvement, the lumber must be estimated according to its value when the bill was filed; and to collect the amount with which the wife's estate is charged, the decree should not direct a sale, but the estate should be leased for term a sufficiently long to extinguish the charge.

Hoot, et al. v. Sorrell, et al.

Writ of Error to the Court of Chancery for Dallas county.

THE plaintiff, Mrs. Catherine Hoot, by her next friend, Julius Sneed, filed her bill, setting forth that her husband sold to John Shields, in February, 1838, certain lands situated in Dallas, in which she was entitled to a right of dower, and which she was unwilling to relinquish, unless an equivalent was given her therefor; that it was thereupon agreed between Shields, her husband, and herself, if she would relinquish her dower to these lands, that then Shields and her husband would redeem a female slave named Milley, and her six children, which had been mortgaged by the husband to John S. McGuire, and would convey the same to her and her lawful issue, free from the claim of them, (Shields and Hoot.) In compliance with this agreement, she did, at the time of such sale, relinquish to Shields her right to dower; and afterwards he and her husband did redeem these slaves from that mortgage; and on the 23d day of August, 1838, conveyed by deed Milley and her children to Isaac N. Campbell, in consideration of the premises; *upon trust*, that he would permit the complainant to possess, control, and enjoy the use of these slaves, and their increase, and all profit derivable therefrom, to her own proper use, during her natural life; free from the control of her husband, the trustee, and all other persons: *Upon the further trust*, that upon complainant's death, the trustee would convey the title of the slaves, or such of them as were then living, to her lawful issue then living, and to the issue, if any, of such as were dead, to be divided according to the statute of distributions of this, or such other State as she, complainant, might reside in at the time of her death. This deed is made an exhibit to the bill, and prayed to be taken as a part thereof.

About the time of the sale to Shields, Hoot, the husband, conveyed about four hundred acres of land to Messrs. Perrine & Crocheron, to whom complainant relinquished her dower, as a part of the consideration of the deed of trust to Campbell, though it is not recited therein.

It is also alledged, that Mary Eleazur, the complainant's mother, then living in South Carolina, sent her four hundred dollars, as a donation, which sum she placed in the hands of

her husband, who invested it in the lands sold to Shields. She therefore insists that she was entitled to the land purchased with her money, free from the claim of her husband or his creditors.

The complainant's trustee, with her separate funds purchased of Henry Moffitt, through his agent, Jesse Beene, lot No. 40, in the town of Cahawba, for the sum of $100; which money has been paid, a receipt given therefor, and an undertaking by the agent to make a title. He also purchased with the trust funds a waggon and two horses, five cows and calves, ten feather beds with bedsteads, and ten single mattrasses with bedsteads; for all which the evidences of purchase and payment are exhibited.

Isaac N. Campbell has resigned and settled his trust, and Wm. E. Bird been appointed in his stead. The sheriff of Dallas has in his hands executions requiring money to be made of the goods and chattels, &c. of the complainant's husband, viz: one in favor of T. B. Sorrell, another in favor of Bernard Johnson, and a third in favor of Paschal B. Traylor. The execution in favor of Sorrell has actually been levied on the slave Milley, and four of her children, also on the lot No. 40, with the buildings which have been thereon erected by the separate funds of the complainant; and the other executions have been levied on a part, or the whole of the trust property, and forthcoming bonds executed, &c. It is alledged that the trustee refuses to protect the trust estate, by giving bond and security to try the right of property, or in any other way. Therefore it is concluded that the complainant is remediless at law—the sheriff and the plaintiffs in the executions made defendants to the bill, and required to answer the same.

The bill concludes with a prayer for an injunction against selling the trust property levied on, or levying on any more —that it be delivered to the complainant's trustee, under such restrictions as the court may prescribe; and that such farther relief as is appropriate be granted.

Sorell, Johnson and Traylor, answer the bill at length, averring substantially their belief, that the dower of the complainant in all the lands referred to in her bill, is worth far less than the slaves which she alledges were conveyed to

Campbell in trust; that if any money was ever sent to her by her mother, it passed into the hands of her husband, and became his own. They deny, according to their belief, that the lot was purchased with money, the separate property of the complainant, or that the buildings thereon were thus erected; or that any of the property mentioned in the bill was purchased with her money. But they declare that the conveyance to Campbell in trust, so far as the complainant or her husband had any agency or interest therein, and all the subsequent transactions relied on by the bill were fraudulent—being intended to delay and hinder the creditors of the latter in the collection of their debts.

The defendants, Sorell, Johnson, and Traylor, filed their bill against the complainant, her husband, and their two sons, and only children, Bird, the trustee of Mrs. Hoot, and Lewis Basset, the lessee of the houses erected on lot No, 40. This bill recites the pendency of the other, &c., impugns the deed by which the slaves are settled upon Mrs. Hoot and her children for fraud, insists that the lot and other property alledged to have been purchased with her separate funds, were paid for with the money of her husband, and that the improvements were made on the lot by him, or through his credit, or money—that the debt on which the judgment in favor of Johnson was rendered, was for lumber furnished to make these improvements, and Traylor's debt was for supplies furnished for the tavern kept therein. It is therefore concluded, that Mrs. Hoot has no separate or exclusive right to the property in question, that her husband being embarrassed, could not make a gift for the benefit of his wife, and that the several transactions are void as it respects his creditors.

The bill prays that an account be taken of the amounts due on the complainant's judgments, that Basset be restrained from paying over the rent to either of the defendants; that all the conveyances in trust may be set aside, and so much of the property delivered up and sold, as will be sufficient to satisfy the complainants their demands, with interest and costs. *Further*, that such other relief as is appropriate be granted, &c.

Jacob Hoot and wife, in their answer, deny all fraud with which they are jointly or individually charged, affirm, that

the slave Milley and her children were settled upon the latter as an inducement for her relinquishment of dower in the lands which her husband sold to Shields, that without such settlement she would not have relinquished it: Further, that Mrs. Hoot received from her mother $400, as a donation, intended for her own use, and to be at her disposal, which her husband invested in the purchase of these lands. They further insist, that she relinquished her right of dower in lands, which the husband sold to Messrs. Perrine & Crocheron, and that lot No. 40, was paid for by Messrs. Perrine & Crocheron, in consideration that Mrs. Hoot would relinquish her dower in certain lands which her husband had sold to D. & C. Ellisor, and the latter to Messrs. P. & C.

These respondents declare, that the improvements were paid for by Mrs. Hoot, with money she had made by keeping a boarding house, and afterwards a tavern, in Cahawba, assisted by the labor and earnings of the slaves which had been settled upon her; and that the other property in question was paid for with her separate funds. They admit the consideration of the indebtedness to Johnson and Traylor to be such as is alledged in the bill, and affirm that the execution in favor of the latter has been fully satisfied by the levy on and sale of property belonging to the defendant therein.

The record is exceedingly voluminous—containing exhibits to sustain all the facts on either side which the pleadings alledge, are shown by documentary evidence, as well as a great number of depositions. The facts proved by the depositions, so far as necessary to be noticed may be thus condensed:

Mrs. Hoot refused to relinquish her right to dower in the lands which her husband sold to Shields, unless Milley and her children were settled upon her, so as to invest her with a separate estate, and free them from liability to her husband's debts. This was assented to, both by her husband and Shields; and thereupon the latter redeemed these slaves from a mortgage made by Jacob Hoot, to John S. McGuire, on which more than $1,800 were due, and made the conveyance to Campbell, in trust for Mrs. Hoot and her children, as alledged in the bills of the respective parties. The sum paid by Shields upon his purchase was $3,000. The land purchased by

Messrs. Perrine & Crocheron was sold to them by Jacob Hoot for $1664; and for joining in the conveyance with her husband, Mrs. Hoot did not require any thing to be paid to her. But Messrs. Perrine & Crocheron purchased of the Ellisors the tract of land which Jacob Hoot had previously sold to them, and she required $100 to be paid for her right of dower in the same; this sum was paid by Messrs. P. & C. by her direction, to Jesse Beene, as agent of Henry Moffitt, in full for lot No. 40, in the town of Cahawba, under a written agreement by the agent, that he would procure a deed from his principal to Mrs. Hoot's trustee.

In respect to the wagon, horses, cows and calves, beds, mattrasses and bedsteads, the proof does not show whose money paid for them. The trustee did not personally superintend the purchases, or furnish the means of paying for them —they were all arranged by Mrs. Hoot, or some one else professedly for her.

Mrs. Hoot contracted with some of the workmen who were employed in erecting the building on lot No. 40, and settled with them herself—others were employed by her husband, who settled with them. One witness says, ten or fifteen workmen were at different periods employed in working on the buildings—another says twenty—all of whom boarded in the house with Mrs. Hoot and her husband. The cost of the improvements is variously estimated at from $1200 to $4000. One of the workmen employed upon them, thinks they were worth $2000—another $1500; the former supposes that no more than $300 or $400 was paid out in cash, and a third witness that the payments in money did not exceed $500. By boarding the workmen a considerable saving was made in the expenditure of money.

Many of the witnesses state that Jacob Hoot was frequently seen working on the house, and sometimes apparently giving directions as to the work. One of the workmen employed upon the building, says he sometimes gave orders in respect to it, but it was by the advice and direction of Mrs. H.; he worked on it some, but his labor was not worth much more than his board—that he had several persons about the house.

A witness who was employed by Mrs. Hoot during the year 1840, states that the building was put up much cheaper

by boarding the workmen—that it was two years in being completed, and that the profits of the tavern were appropriated towards paying for it. Jacob Hoot he thinks worked but little upon the improvements, but his wife is economical and industrious. He also testifies that Milley and her children, except the youngest, are able to labor. Their yearly value is variously estimated at from $125 to $300.

Henry, the son of Jacob and Mrs. Hoot, worked some on the house—assisting the mason about the chimney and pillars.

One witness states that Mrs. Hoot gave him $93 or 94, and her trustee, Campbell, 6 or $7 to enter land for her, and with it he entered a part of that purchased by Shields—but in whose name he made the entry, he does not remember. He also saw Mrs. Hoot pay $100 for the land which Ellisor sold to Messrs. Perine & Crocheron. Both of these transactions took place after he understood that Mrs. H's mother had sent her money from South Carolina.

It was further proved that Mrs. Hoot opened a boarding house in Cahawba in the fall of 1838, previous to the purchase and improvement of lot No. 40, and continued to keep either that description of a house, or a tavern, until the new establishment was completed. Hoot was a bricklayer—sometimes worked at that business; but most of the witnesses think he was not very profitably employed.

The lease to Basset was at an end, and the possession of the premises abandoned by him. Traylor's execution, the sheriff testifies was returned, satisfied, after the commencement of this suit.

The two bills were heard together upon the exhibits and proofs—the latter being considered a cross bill. The chancellor was of opinion that the value of the slaves settled upon Mrs. Hoot greatly exceeded the value of her right to dower in the several tracts of land mentioned in the bill, yet as its relinquishment formed the consideration of that settlement, he sustained it. But it was considered that the proofs did not support her title to the lot and improvements thereon, or to the other property on which the executions were levied. It was therefore ordered and adjudged that the deed to Campbell for the benefit of Mrs. Hoot and children continue

Hoot, et al. v. Sorrell, et al.

in full force; and the slaves therein mentioned be held by Wm. E. Bird, as Campbell's successor in the trust.    That lot No. 40, with the improvements thereon, and the other property in question, is liable to satisfy the judgments in the cross bill so far as they remain unsatisfied, and that the trustee hold the same for that use and purpose; and that he deliver the same to the register upon demand, or account therefor.

It was further ordered and adjudged, that the register ascertain the amounts due upon the respective judgments for principal, interest and costs; that unless the amounts so reported, be paid within thirty days from the adjournment of the court, together with the costs of this suit, then the register proceed to sell, &c. for cash, so much, &c. as shall be sufficient to pay these several sums: *Further*, that all the right and title of Wm. E. Bird as trustee, and Jacob Hoot and wife, pass to, and be vested in the purchaser.

The complainants in each bill being dissatisfied with the decree, have prosecuted writs of error, and here assign errors.

J. P. SAFFOLD, for the plaintiff in error, made the following points:    1.  A court of chancery will not avoid a contract for mere inadequacy of consideration; but to induce its interference, the inequality must be so great as to shock the understanding of mankind, and lead the mind to the conclusion that the transaction is fraudulent.   [Story's Eq. 259, § 244-5; 2 Johns. Ch. Rep. 1-23; 14 Johns. Rep. 527; 2 Hill's Ch. Rep. 126; Rice's Eq. Rep. 84; 2 Stew. Rep. 407.]

2. An agreement between husband and wife, though it be by parol, that the former would purchase land, build thereon and convey it to the wife, in consideration that she would unite with him in a deed conveying real estate, and thus relinquish her right of dower, is good, and will be upheld; though the interest which the wife parted with, was worth much less than the land settled upon her in return.   [6 Munf. Rep. 1; 4 Id. 251; 1 Rand. Rep. 219; 4 Dess. Rep. 227; 2 Hayw. Rep. 332; 2 Rand. Rep. 563.]

3. The mere fact of an existing indebtedness does not make an absolute conveyance fraudulent or void in law

50

against pre-existing creditors, if there was no intention to delay or defraud them. [6 Paige's Rep. 62.]

4. An answer responsive to the stating part of the bill, or to an interrogatory intended to elicit a discovery is evidence in his favor, and must be overbalanced by proof in order to do away its effect. [3 Stewt. Rep. 95, 233; 3 Ala. Rep. 478; 4 Id. 60; 10 Yerg. Rep. 59, 105; 2 Rand. Rep. 575; 1 Cow. R. 711.] Affirmations in an answer when responsive, need not be proved; and the answer is conclusive so far as it is a response to a discovery sought of a particular fact. [1 Bibb's Rep. 253; 1 Day's Rep. 156.].

5. Extrinsic evidence is admissible to establish the consideration of a deed which upon its face appears to be voluntary, if it is impeached for fraud; and although a consideration is expressed, it is allowable to prove an additional one, not inconsistent with it. [5 Stew. & P. Rep. 410; 2 Ala. Rep. 602; 1 Rand. Rep. 219; 4 Munf. Rep. 251; 2 Call's Rep. 125; 2 Hill's Ch. Rep. 562; 1 Bail. Eq. Rep. 138.] Some of these citations show that greater indulgence is extended to *femes covert* and infants, than to others who are not compelled to confide so much in others; and that the relinquishment of the wife's estate, or a claim she may have upon her husband's, is a good consideration for a settlement or conveyance of property by the husband for her benefit.

6. The declarations of a party, made after he had executed a deed, are inadmissible to impair its efficacy. [1 Stew. R. 198; 2 Rand. Rep. 576.]

7. Whenever the wife's fortune is under the direction and control of a court of equity, the husband will not be permitted to possess himself of it until he has made a suitable provision for her. [Clancy on Rights, &c. 441; 13 Maine's R. 124; 2 Hill's Ch. Rep. 104.]. An unreasonable settlement should not be made with the view of defrauding the husband's creditors; but where he settled less than one-half the estate he acquired by her, it was not thought unreasonable. [2 Hill's Ch. Rep. 566.] Under some circumstances, it would not be unreasonable to give him all. [6 Johns. Ch. Rep. 25; 5 Id. 467.]

8. Where a father gives property to his daughter, a married

woman, the presumption is, that it was intended for her separate use. [4 Dess. Rep. 550.]

9. The wife's equity is to be preferred to the claims of her husband's creditors—property which falls to her during coverture by devise, descent, &c. are not subject to their demands. [5 Monr. Rep. 340.]

10. The separate estate of the wife, is not liable for her general engagements not closed by a note. [Clancy on Rights, &c. 441.] Nor is it liable for the expenses of herself and children under ordinary circumstances. The husband, if able, must support his family, and the wife's property cannot be appropriated to the payment of debts he may contract upon that account. [1 Hill's Ch. Rep. 234.]

11. Although the complainant verifies his bill by an oath, yet the positive denial of the answer will not be overbalanced by the testimony of one witness unsupported by other circumstances; but this rule does not apply where the defendant's means of information are defective, and he gives no good reason for his denial. [4 Stew. & P. Rep. 410.]

12. The complainant ought not to pay costs, because she was compelled to come into this court to protect her rights. [6 Johns. Ch. Rep. 25.]

13. Where a mortgagor applies to a third person to borrow money to pay the debt secured, and promises to give him the same security as the mortgagee then had, if he receives the money and takes an assignment from the mortgagor to the lender, it will be upheld, and considered an available security for the benefit of the latter. [8 Paige's Rep. 173.]

14. A cross bill is generally considered as a mode of defending the suit, and set down for hearing with the original bill as one cause. [1 Hopk. Rep. 58; 4 Johns. Ch. Rep. 357; 7 Id. 252.] But the delay of the complainants in the cross bill to prepare for a hearing will not delay the hearing of the original cause. [2 Paige's Rep. 164.] A cross bill should not be filed after publication, (Story's Eq. Plead. 315); nor can it be sustained on matters which do not grow out of the original bill. [6 Dana's Rep. 186.]

C. G. EDWARDS, for the defendants in the original, and complainants in the cross bill, insisted that the settlement of

the slaves upon Mrs. Hoot cannot be supported. They are confessedly of far greater value than her right to dower in the lands, for which they were given as an equivalent; thus far, then, the deed is without consideration: . Besides, the disparity is such as to be evidence of a fraud. Nor is this the only evidence of fraud—taking the entire transaction into view, with the circumstances which preceded and followed it, and there can be no question that not only Jacob Hoot but his wife meditated rather a fraud upon his creditors, than an intention to secure Mrs. H. a legal benefit.

The decree is also erroneous in directing the costs to be paid from the proceeds of the property condemned to the satisfaction of the judgments.

COLLIER, C. J.—The right of dower depending upon the wife's surviving her husband, is regarded as valuable, and protected not only by the common, but by the statute law; and it depends upon her own volition, whether she will yield it up or not. She may gratuitously renounce it in favor of her husband, or may require something to be paid for it, or property to be settled and conveyed to her separate use, as an inducement to her relinquishment. In Taylor v. Moore, 2 Rand. Rep. 563, it was decided that if a married woman relinquish her dower in lands, under a promise that other property shall be settled on her as a compensation, such settlement will be good, although made after the relinquishment. See also, 1 Rand. Rep. 219; 4 Munf. Rep. 251; 9 Leigh's Rep. 200.] It has been held, that when a legacy is given to a widow, in lieu of dower, she takes as a purchaser for a valuable consideration, and is entitled to be paid in preference to legatees who are mere volunteers. [6 Metc. R. 50.] So a court of equity has sustained a conveyance by the husband in trust for his wife and her issue, as well as purchases made on her behalf, where the husband has received and applied to the payment of his debts, or other uses, funds or property of the wife; although the value of what the husband appropriated was less than the property settled upon the wife. [4 Dess. Rep. 227; 1 Dev. Eq. Rep. 185.]

It has been supposed that a wife may sell her separate estate to her husband, and with her separate estate may pur-

chase from him, and the purchase will be protected against creditors. [Clancy's Husb. & W. 350; 2 Bro. Ch. Rep. 51; 2 Vesey, jr. Rep. 698; 10 Ves. Rep. 139.] Although the husband is not bound to account to the wife for her separate estate which she has permitted to go into his possession, without objection, [Clancy's H. & W. 352; 2 Ves. jr. Rep. 488; 2 P. Wms. R. 82;] but if it was received by him without her knowledge, he was held to be chargeable. [Clan. H. & W. 351, 354.] So if the wife advance her separate property as a loan to her husband for the payment of his debts, she is entitled to stand in the place of the creditor. And where the separate money of the wife is applied by the husband in the purchase of an estate, she will be an incumbrance upon it to that extent. [Clan. on H. & W. 612; 2 Atk. R. 383; 5 Mad. R. 414; 10 Ves. R. 511.]

In Huber v. Huber's adm'rs, 10 Ohio Rep. 371, it was held, where money comes to a wife in right of a former husband, and the second husband borrows it from her, and gives her a note for it, the note is good, and after his death she may set it up in equity against him. Even gifts between husband and wife have been supported in equity, although a court of law does not recognize them. [1 Atk. Rep. 270.] So where the husband voluntarily allows the wife for her separate use to make a profit of various articles beyond what were used in the family, of which she saved £100, which the husband borrowed; the wife's right to the money will be upheld *against his estate*. [3 P. Wms. Rep. 337.] It has been repeatedly held, that a court of equity will sustain a *post nuptial* conveyance by the husband to the separate use of the wife, where the consideration is property received from her. [2 Rop. on H. & W. 227; Reeves Dom. Rel. 166; 1 Atk. R. 269; 10 Ves. R. 146; 2 John. Ch. Rep. 537; 7 Johns. Ch. Rep. 57; 4 Mason's Rep. 443.]

In Picquet v. Swan, et al. 4 Mason's Rep. 443, Judge Story says, "It is common learning that a post-nuptial settlement may be made for a valuable consideration, by a husband upon and for the benefit of his wife. And even a voluntary settlement, without such consideration to support it, would be upheld, if the husband were not in debt at the time, or the settlement were not disproportionate to his means, tak-

ing into view his debts and his situation.". The learned Judge considered these propositions as so well established, that he does not pretend to discuss them, but merely cites some few of the numerous decisions which establish them. See Kent's Com. 145; Roper on H. & W. ch 8, § 2, pp. 301, 304, 306, 307, 309; 3 Johns. Ch. Rep. 481; 8 Wheat. Rep. 229.] It was insisted in that case, that although the settlement might be valid, yet, the moment the proceeds or income arising from the property secured, were paid by the trustees into the hands of the wife, they ceased to be trust funds, and were immediately liable to the payment of the husband's debts, in the same manner as if they had been her property, not secured by trusts. The court said, " This proposition is utterly untenable in a court of equity. It involves in effect a total defeat of the original trusts. These trusts were to secure the income and proceeds to the sole and separate use of Mrs. Swan, with an unlimited power to dispose of them as a *feme sole.* Nothing is more clear, than that the separate property of a *feme covert*, secured or given to her separate use, will be upheld for her use by a court of equity. Into whosever hands the same may come, whether of a stranger, or even of the husband, if it comes clothed with the trust, and with notice of it, the party so possessing it, becomes a trustee for the *feme covert.* It is in no sense the property of the husband, and can never become his, except by a voluntary appropriation of it to his use, by the wife herself. She may invest it as she pleases; and appropriate it to furniture, or pictures, or plates, or jewelry, or bank stock, or other securities, or personal ornaments, or paraphernalia, still it is her own, and cannot be touched, while she retains her power and dominion over it." *Again:* "Indeed, the moment courts of equity decided that *femes covert* could hold separate property to their own use as *femes sole*, it was a necessary consequence, that the protection of it should be as universal as the right." See 2 P. Wms. Rep. 316; 3 Bro. Ch. Rep. 7; 9 Ves. Rep. 369; 3 Thomas' Co. Lit. 132, note N.; 3 Id. 309, note O; 314, note R; Atherly on Mar. Set. ch. 21, p. 330; ch. 22, p. 334; 1 Mad. Ch. Prac. 376; 2 Johns. Ch. Rep. 543; 17 Johns. Rep. 548; 2 Kent's Com. 136; 2 Rop. on H. & W. ch 19, pp. 179, 184, 185, 226,

227; 3 Harr. Rep. 87; 20 Pick. Rep. 556; 2 Ired. Rep. 553; 5 W. &. Sergt. Rep. 494; 15 Verm. Rep. 525.

But it is said that the husband is entitled to all sums of money which his wife earns by her skill or labor; and if he die without having recovered them, they do not survive to her, but his executors shall have them. So he is entitled to money lent by her, or received by a third person on her account during the marriage. [Clan. on H. & W. 3.] This learned author says, that the separate provisions of married women are of two kinds; first the property which is bequeathed to their separate use; secondly, the allowance which is made to them by their husbands, before or during marriage, for their maintenance upon a separation. And the difference between the first and second kinds of provision is this, the former being for her separate use, is her separate estate, of which she may dispose as she thinks fit; but the latter being destined for personal enjoyment, it would be contrary to the intent of its creation, if she were capable of depriving herself of it. If she save money out of her separate estate, the savings are always hers, against all claimants. And if she purchases lands and houses with what she has saved, the court will follow the purchase, and secure it against the husband for her benefit. [pp. 271 to 276.]

In respect to the slaves which were redeemed from the mortgage by Shields and conveyed by him and J. Hoot to a trustee for the benefit of Mrs. Hoot and her children, we think the citations we have made very fully support it. That the relinquishment of the wife's contingent right of dower in the lands of her husband is a sufficient consideration for a settlement, has not been controverted, and we think cannot be successfully gainsayed. True, the slaves were worth half as much as the entire purchase money of the land, and consequently more than the dower of the wife, even if it had been a vested interest. Yet it cannot be affirmed that the transaction was fraudulent. Perhaps it was desirable that the debt secured by the mortgage might be extinguished, and the residue of the purchase money might be turned to a better account than the occupancy of the land by the husband; so that it was really for his interest to yield to the requisition of his wife. Be this as it may, her contingent right could

only be acquired by her relinquishment. If in good faith she placed an estimate upon it far beyond its true value, we know of no warrant for the imputation of *mala fides*. It cannot be predicated of the disparity in value between what she yielded up and what she received in return. The difference is not under the circumstances of the case so great as to shock the common sense of mankind and furnish in itself conclusive evidence of fraud. If fraud is not a necessary deduction, then the inequality between the property settled and the consideration for the settlement, will not authorize a court of equity to set it aside. [Juzan, et al. v. Toulmin, 9 Ala. Rep. 662.] This course of reasoning very fully supports the purchase which was made for Mrs. Hoot's benefit, of the lot in Cahawba; the consideration on her part being the relinquishment of the right of dower in a tract of land which the husband had previously bargained and sold. The purchase of the lot cost but one hundred dollars; and the inference is reasonable that this sum did not exceed, the value of her contingent right, if that right be susceptible of estimation.

If the wife, in relinquishing her contingent interest may stipulate for an equivalent, what rule of law inhibits her from making the best bargain she can, consistently with honesty and fair dealing? Equity will not adjust with the most exact scales, (even if it were possible,) the relative value of the interest renounced, and the money or other thing given for it. The difficulty of estimating the worth of a right of dower, which may or may not attach—the uncertain, imaginary and fluctuating value of land, in this country, all considered, should induce much hesitation before any tribunal would pronounce against a transaction like the present, merely because the wife received an immediate interest of greater market value than her dower would have been, had it actually vested in possession. We repeat that she might not thus have appreciated it. The effect of fraud, in fact, would be to divest the wife even of an equivalent, the proof therefore should be most convincing to establish it.

. It may be added upon this point, that it is in proof that Mrs. Hoot's mother in 1834, sent from South Carolina $375 to $400 in specie, which the carrier was directed not to pay to

J. Hoot, unless his wife was present to sign a receipt—it being remarked by the person who delivered it to the carrier, that it was for Mrs. Hoot, and not her husband.   The carrier delivered the money to Mrs. Hoot in her husband's presence, and a receipt was signed by both of them.   Several witnesses suppose that the land or a part of it sold to Shields was purchased from the United States with this money; but as they do not speak from any knowledge of their own, their testimony upon this point cannot be regarded.   One witness however testifies that he received from Mrs. Hoot $92 or $93, and from her trustee, Campbell, an additional sum— making in all $100, which according to her directions he invested in the entry of a half quarter section of the land which the husband sold.   We do not mention these facts as establishing a resulting trust in favor of the wife or an equitable incumbrance upon the lands to which she relinquished her right to dower, to any definite extent ; but they certainly present her to the court in a more favorable attitude.

In respect to the furniture and other personal property which were purchased in the name of Mrs. Hoot's trustee, there is no evidence that her husband furnished any part of the money to pay for it, or that he had the means to expend in that way, had he been so inclined.   It is shown by the testimony, that he was embarrassed as early as 1838, and that since that time his visible estate has been devoted to the payment of his debts.   We cannot, then, in the condition of the proof, undertake to say, that this property was paid for by J. Hoot ; the proof shows that it is altogether probable the business in which his wife employed the slaves which were settled to her separate use, enabled her to make purchases to that extent.

It is shown by the testimony that the lot in Cahawba, which was purchased for Mrs. Hoot, has been improved by the erection of buildings thereon, the cost of which is variously estimated from $1200 to 3000.   The larger portion of this expenditure it is probable has been met by money received for the hire of the slaves, in which Mrs. Hoot has a separate estate, and from their employment in a boarding house and tavern under her direction.   Yet it is obvious from

51

the proof, that her husband furnished a portion of the materials of which these buildings were erected—to what extent, the evidence does not indicate with the precision desirable. A question arises in this posture of the case, Can the creditors of the husband subject the separate estate of the wife to the extent of the property or money appropriated by the husband towards its improvement?

In Ewing v. Cantrell, Meigs' Rep. 364, W, the brother of Mrs. C, conveyed to her son several acres of land in the vicinity of Nashville, in trust for the separate and exclusive use of Mrs. C. during her life. The trustee was to permit his mother to have, receive and enjoy the use, occupation and possession of the premises, free from all claims, rights and demands of her husband; and upon her death the premises were to revest in the grantor, as if the conveyance had never been executed. During the same year in which the conveyance was made, the trustee with the knowledge of his mother, "but of his own accord," made improvements by building on the premises, houses designed for his mother's use, which cost $4756 97 cents. Of this sum, $2644 34 cents, were paid by means of the separate property of the *cestui que trust*, and $148 21 by her husband, leaving a balance of $2112 53 cents, which was provided by the trustee from his own funds, and was intended by him as a present to his mother.

At the time of this gift by the son he was insolvent, though the fact was unknown both to his mother and himself. A judgment being afterwards recovered against the son, and an execution issued thereon returned "no property found," the judgment creditor filed his bill, among other things to subject the separate estate of Mrs. C. to the extent of the sum her son had given in payment for its improvement.

The chancellor granted relief to the complainants, and the cause being removed to the supreme court, it was there said, that there was no pretence of a trust, secret or otherwise, between the mother and the son—nor that it was intended to hinder and delay the creditors of the son in the collection of their debts—the proof showing no ground for the imputation of intentional fraud by the parties; and there being nothing of which the relation of debtor and creditor between the mo-

Hoot, et al. v. Sorrell, et al.

ther and the son could be predicated.   It was conceded that the statute of frauds made void every gift, grant or conveyance of lands, &c.  "made of fraud, malice, covin, or collusion  to hinder, deceive, delay," &c.; yet if money be given by an embarrassed man to  his relation or  friend, not upon any secret trust, to be implied from the circumstances or otherwise—but absolutely, and for the benefit of the  donee, it could not be affirmed  that  the transaction in virtue of the statute made  the latter a debtor to the donor's creditors   The court cited 1 Ves. Jr. Rep. 196 ;  1 Ans. Rep. 381;  1 Ball & B. Rep. 387;  9 Ves. Rep. 189;  10 Id. 368 ;  6 Yerg. R. 185, which it was supposed maintain that the jurisdiction of courts of chancery in cases arising under the  statute is ancillary to the courts of  law, and intended to  give effect to the lien  of creditors by judgment and execution ; and unless the execution creates a lien, the  assistant jurisdiction cannot be exercised.    So, if the son, without any trust, secret or otherwise, gave to his mother the money in question, she would not be treated as  personally the  debtor of the son's creditors ; and the creditors cannot treat her or her land, as being  liable  to them.    Their judgments create no lien upon her separate estate, nor their *fi. fa.* upon the funds invested in its improvement ; nor is she debtor to her son.

It was admitted  that if one person  expends his money in improving the real estate of another under such circumstances as to show a  fraud, and  that the latter was a  participator in it, the owner of the estate would be chargeable with a trust. The difficulty of granting the relief sought is noticed  by the court, and it is asked what shall the creditors sell to  satisfy the debt ?   The house, or the house and the  land also ?   If the land, because it is a small tract, would it not on the same ground be sold, if it contained as many hundred acres ?   And can the reversionary interest of the grantor be sold ?   These questions were  left unanswered—the  decree  was reversed and  the  bill  dismissed.

We have noticed this case thus at large, because it seems to have been well considered, and discusses principles which are cognate to those applicable to the case at bar.    We cannot, however, regard it as decisive, and will consider as briefly as may be the points of difference.

The power of the wife over her separate property, it is said, depends on the intention of the donor, as it may be collected from the instrument by which the interest was created. It is said to be a rule in equity, " that a *feme covert* acting with respect to her separate property, is competent to act in all respects as if she were a *feme sole.*" But this rule, it is said, does not apply to real estate limited to the separate use of a married woman and her heirs ; for she is not considered as the absolute owner of such property by virtue of this limitation, as a *feme sole* would be. It must be understood only of that kind of interest belonging to the wife, which the law would give to the husband on his marriage, as personal property, and the rents and profits of her real estate during her life. [2 Ves. Sr. Rep. 190; 1 Bro. Ch. Cases, 19.] A married woman being thus capable of possessing property to her separate use, and disposing of it, a court of equity, it is said, will consider her so far distinct from her husband as to suffer her to be sued by him, or to sue him; or to be sued by, or to sue any other person with respect to that property. [Prec. Chan. 24, 275; 2 Eq. Ca. Ab. 144; see Mitf. Plead. 83 ; 3 Atk. Rep. 478 ; 3 Mad. Rep. 474; 1 Ves. Jr. R. 278 ; 9 Id. 486 ; 1 Chan. Cas. 35 ; 2 Ves. Sr. Rep. 452; 3 Johns. Ch. Rep. 77.]

It is said to be settled, that the separate estate of a *feme covert* cannot be made liable to general demands against her ; that is where her engagement is merely implied, and not reduced to writing. In Nantes v. Corrock, 9 Ves. Rep. 182, it was attempted to charge the separate estate of a married woman, without any lien, but merely on the ground that it was the produce of a fraud alledged to have been committed by her upon the rights of the plaintiff; and the bill was dismissed. But in that case the property was stock, against which execution could not be given in equity, as there was no express lien upon it ; and this consideration seemed to have influenced the judgment of the Lord Chancellor. It was however said by the Vice Chancellor in Greatly v. Noble, et al. 3 Mad. Rep. 89, " If it were necessary now to decide the point, I think it would be difficult to find either principle or authority for reaching the separate estate of a *feme covert*, as if she were a *feme sole*, without any charge

on her part, either express or to be implied." Clancy, in his treatise upon the rights of husband and wife, (p. 346,) says the present state of the law seems to be this, that if a married woman having separate property, executes a bond or note, or any other instrument by which she undertakes to pay money, that property will be bound by her engagement, though the instrument which she has signed does not purport to be a lien upon it. But if the demand against her arise merely from an implied undertaking, her separate estate cannot be charged with its payment. The learned author however admits that the law in respect to the liability of the wife's separate estate to her general engagements is so unsettled, that no clear result can be stated. [See 1 Bro. Ch. Ca. 16; 4 Id. 483; 1 Ves. Jr. Rep. 189; 4 Id. 129; 15 Id. 596.]

In Dyett v. N. A. Coal Co., 20 Wend. Rep. 570, it was held, that the separate estate of a *feme covert*, in the hands of trustees, is in equity chargeable with debts contracted for the benefit of the estate. So such estate is chargeable, where a portion of it has been converted into other property, in conformity to the provisions of the trust deed, and a debt is contracted for the benefit of such substituted property. See further as to the power of the wife to deal with her separate property, and even with respect to the husband himself, Clancy on Rights, &c., 347, 350, 351, 355, 612.]

In the case cited from *Meigs' Reports*, it must be observed, that Mrs. C. had but a life estate in the premises, and that after her death, they were to revert to her brother, the grantor, as if they had never been settled on her: *further*, it was supposed that the expenditure of the son's money was a gratuitous act on his part—was a gift, and did not create an indebtedness, or *secret trust* in his favor, within the meaning of the statute of frauds. That he had expended his money without the request of the mother, when she had furnished the means of making such improvements, (for any thing appearing to the contrary,) as she desired; that the *fi. fa's* in favor of the son's creditors did not give a lien upon the money thus invested by him ; and as the mother was not made the son's debtor in virtue of the transaction, her estate was not chargeable to his creditors.

In the case at bar, the proof shows, that the buildings erect-

ed upon Mrs. Hoot's lot, if not projected by her, were made professedly under her supervision and control; and that her husband purchased lumber at the cost of several hundred dollars, which was used in making these improvements. Although this lumber was never paid for by the husband, yet it became his property, and while it remained in the state in which he acquired it, was subject to seizure and sale under an execution against his goods and chattels. There then can be no objection to the relief sought, so far as it respects the lumber, on the ground that it was intangible by a *fieri facias* Mrs. Hoot could not have been ignorant that her husband furnished it—the quantity was too large to allow such a supposition, and the inquiries she must have made of her workmen, would have informed her of the materials necessary to make the improvements; so that the conclusion that Mrs. H voluntarily accepted her husbad's bounty, at least to the extent here indicated, is but natural, and under the circumstances cannot be avoided.

Here, in legal effect, was the gift of property, by a husband in embarrassed circumstances—in fact he owed the debts which the complainants in the present case are seeking to collect, at the time he exercised his bounty. According to repeated decisions of this court, a gratuitous conveyance of property by a debtor is void absolutely, as to pre-existing creditors, and if made with the intention to defraud, will be avoided as to subsequent creditors. [2 Stew. Rep. 214; 3 Porter's Rep. 196; 6 Ala. Rep. 506.] There can be no doubt but the husband could not have given the lumber to the use of his wife, so as to defeat a creditor; but as it has been converted into fixed improvements, and has become attached to the soil, it is a question of some perplexity, to determine how the value of it can be reached by creditors. If it had been officiously appropriated, we will not inquire whether it could be sequestered at a creditor's suit; but here the circumstances are such as to warrant the inference of a concurrence by the husband and wife.

In Nantes v. Corrock, 9 Ves. Rep. 189, Lord Eldon said, "One of the greatest difficulties that has occurred in this court is, how to give any execution against the property of a married woman; and in Hulme v. Tenant, Lord Thurlow

went no further than the rents and profits of her estate; not as to the estate itself; and clearly not against her person." In the present case, the interest to which the creditors of the husband are entitled, is so commingled with that of the wife, that it is impossible to separate it; and it would be unjust that the wife should be divested of her entire estate. Under such circumstances, the lot with its improvements should be leased for a term sufficiently long to extinguish the charge; unless Mrs. Hoot, or some one for her, shall within some reasonable time to be prescribed by the chancellor, pay the amount.

The sum to which the creditors are entitled, is the value of lumber furnished, with interest thereon from the commencement of the suit—and in estimating the value, reference will be had to the same period. Of course the aggregate will be divided between the complainants whose executions are unsatisfied, in proportion to the amounts respectively due to them.

It does not appear that the husband expended his money in improving his wife's estate; and we are consequently relieved from the necessity of inquiring whether such a donation could be reached by his creditors.

The proof shows that the husband occasionally expended a little labor about the improvements; but all the witnesses who speak of it, concur in the opinion, that his labor was worth but little, if any, more than what his wife furnished him to eat. Bnt, be this as it may, we cannot very well perceive how the value of the personal labor of the husband employed in the improvement of the wife's separate real estate, can be devoted to the payment of his debts. Creditors cannot force their debtors to work, however much the dictates of honesty prompt to economy and industry; and if a man labours without compensation, his creditor cannot charge him who receives the benefit. The transaction did not make the lattter a debtor to the laborer; and the creditor cannot at his mere volition make that a debt which was intended as a gratuity. It must be admitted that the labor was not susceptible of seizure under execution; and the ancillary jurisdiction of equity cannot operate upon it.

Upon a view of the entire case, we are satisfied that the chancellor erred. His decree is accordingly reversed, and the cause remanded, that it may be proceeded in according to the following instructions: Upon this case being remanded, the register will take an account of the amounts due to the complainants upon their respective executions; he will also ascertain how much lumber was furnished by Jacob Hoot, and appropriated in the improvement of his wife's lot (described in the bill,) in the town of Cahawba, and what the value of so much lumber when the *complainant's* bill was filed; upon this latter sum he will add interest from that period down to the time of making his report. Having performed the duty hereby devolved upon him, the register will make a full report thereof to the term of the court of chancery next hereafter to be holden in Dallas county. And the chancellor will thereupon render such decree as we have indicated will be proper.

The costs of *this court* will be paid by Thomas B. Sorrell and the complainants associated with him.