# PRACTICE REPORTS.

## SUPREME COURT.

### Moore agt. Livingston and wife.

A and B were men of intelligence, education and wealth, and fast, mutual and confiding friends. A became involved, and very much feared, by the pressure of some of his creditors, that his valuable real estate (worth some $11,000) would be sacrificed. On consultation with B, it was agreed that B should, through a third person, a stranger to A, but a friend of B, purchase A's property for B's wife's sister, à single lady of wealth. The conveyances were made, the consideration $10,650, ostensibly paid by B, for his wife's sister, to the third person for A, and the conveyances delivered, and the first conveyance (from A) immediately recorded; but the deed from the third person to B's wife's sister was not recorded for more than two years afterwards. B took possession of the premises, received the rents for years thereafter, and, during the time, made improvements at an expense of many thousand dollars, by or on behalf of his wife's sister, who subsequently became the wife of B

A having succeeded, in a great measure, in averting the storm of litigation which he apprehended from his creditors, by assurances to them in different forms that said conveyance made by him was *bona fide* and in good faith, subsequently requested a reconveyance of the property from B's wife's sister, the grantee; which reconveyance appeared to have been executed and delivered to A, and remained in his possession some eight months, when, by some unexplained circumstance, it came into the possession of B, where it was last seen. A difficulty arises between B and his wife and A, and A brings his action against them to recover back or be restored to this reconveyance.

*Held*, that by the pleadings, and the testimony upon the trial of the cause, it was established beyond doubt that A and B were the only real parties to the transaction respecting the conveyances from A to the third person, and from the latter to B's wife's sister; that no money, in truth, was paid as a consideration

Moore agt. Livingston and wife.

of the purchase, and that the property was, in effect, placed under B's control, and as a mere cover. It was a *gratuitous secret trust* for the benefit of A.

If the case rested here, whatever might be its moral merits, or its merits tested by the code of honor among men, *in law*, it would admit of but one result. No man, creating a secret trust to defraud the law, can call upon the law to relieve him from the consequences of such misplaced confidence. His act is a *misdemeanor*—not in himself only, but in every person being a party or privy to the conveyance, or knowing of it, who shall willingly put the same in use, as having been made in good faith. Yet, as *between the parties,* the conveyance is valid; and the title vests in the person named as alienee, subject only to the *rights of creditors* at the time; and as against them it is *void*. The *fraudulent grantor* is *estopped by his own act.*

It appeared, however, from the weight of testimony, that a *deed of reconveyance* to A was actually executed by B's wife's sister previous to her marriage, and delivered; that, as a muniment of title, it lawfully became and was A's property; that B subsequently, in some way unexplained, repossessed himself of the instrument, and wrongfully withholds it. Therefore, *held*, that A is entitled, lawfully as well as justly, to a decree for its restitution, and for an account of the rents and profits.

As between A and B, there was an implied promise, and a high moral and honorary obligation on the part of B to give such reconveyance. It was not for B to vindicate the law. By his own showing, although *particeps criminis,* he was the friend of A. He had paid nothing, and was to pay nothing for the property. It was a mere naked trust—fraudulent as against the policy of the law, but binding in "friendship" as between persons equally guilty. The law was violated, but B violated it as much and as knowingly as A. He should not, therefore, in a case of any doubt, be permitted to profit by the wrong.

The dignity of the law, in a doubtful case, will be better satisfied by restoring the property to its real, if not its technical owner, than bestowing it as a reward for what cannot but be regarded as gross private treachery, unqualified by any pretence, even of disinterested public service.

*New-York Special Term, March,* 1857.

MOTION by plaintiff, after trial by the court, for judgment or decree, restoring to him a reconveyance of real estate, &c.

FRANCIS G. YOUNG & JAMES T. BRADY, *for plaintiff.*
M. PORTER & CHARLES O'CONOR, *for defendants.*

ROOSEVELT, Justice. In examining this case, I have felt myself compelled, by the evidence, to regard it as a controversy between Livingston and Moore exclusively. The successive wives of the former, whose names have been introduced

Moore agt. Livingston and wife.

into the transaction, appear, for reasons which I shall hereafter explain, to be, and to have been throughout, merely nominal parties.

The suit, in its consequences, involves the title of a valuable property in Broadway and Cortlandt streets, which, it is conceded, at one time belonged to the plaintiff, Dr. Moore, but which (having put it out of his hands to defeat the claims of creditors) he cannot, in law, recover back, unless by showing some exceptional circumstances, exempting him from the application of the rule, that no man defying the law can invoke the law to aid or to extricate him. The plaintiff accordingly sets up a reconveyance, once in his hands, and now in the defendants, and has sought to prove its execution and delivery, which the answer denies. And the question is—the main and only *ultimate* question to be determined—was the alleged deed·of reconveyance ever executed? or, in other words, was there at any time such an instrument, or any instrument of like import, in existence, executed by the defendants, or either of them, to the plaintiff, the possession of which the defendants have obtained and wrongfully withhold?

Moore, in his complaint, which was put in under oath, not only alleges the execution and delivery of the instrument, and his actual though temporary possession of it, but specifies minutely its character, contents and attending circumstances.

It was dated, he says, on or about the 1st September, 1845; the grantor's name was Eliza Blackwell, then the sister-in-law, now the second wife of the defendant Livingston; the grantee was himself, Michael Price Moore, the then friend, now antagonist of Livingston; the consideration was $11,000; the premises one undivided half of lots Nos. 104 Broadway and 52 Cortlandt-street, giving the dimensions of each; the date of the acknowledgment on or about the 1st September, 1845, and the name of the commissioner, Dayton Hobart.

These averments, as already observed, are not made on mere information and belief: for the plaintiff, in addition, alleges that the conveyance, after its due execution and acknowledgment, was " *delivered* by the defendant Eliza Blackwell to the

plaintiff," and remained in his *possession* for a period of "up-
wards of eight months." Nor is this all; "the consideration,"
which, it will be recollected, was the very considerable sum of
eleven thousand dollars, was, he alleges, "duly settled and ad-
justed between them, previous to such delivery."

Here, then, are the plaintiff's own acts, and of course, if true,
"his own knowledge." It was *he* that paid the considera-
tion, and *he* that "received and accepted" the deed; and it
was *he* that had possession of it for eight months and upwards.
Is this positive oath, then, of the plaintiff—for being contro-
verted as a pleading by the sworn answer of the defendant, it
is by law no evidence of itself—sustained by the proof.

Whatever may be the absolute justice of the plaintiff's claims,
(and they certainly, as will presently be seen, are not without
support in the evidence,) one striking omission on his part can-
not fail to excite surprise. Although a whole week was con-
sumed in the trial, and every opportunity afforded for the full-
est possible developement of the truth, not a particle of evi-
dence was offered to substantiate the alleged payment of the
eleven thousand dollars, the payment of which to Miss Black-
well is said to have been acknowledged by her, and to have
been the consideration for which she "sold and conveyed" the
property in dispute to the plaintiff. On the contrary, the whole
tendency of the plaintiff's efforts, on the trial, was to overthrow,
and not to substantiate, this allegation of his complaint; and to
show, in the language of his own letter, that as the defendant
"received" the property from him "without consideration,"
she should "return it" to him in like manner, when requested;
and that to do otherwise would be nothing less than an act of
"high-handed villany," the very "thought" of which, unless
under a "delusion" practiced by her then brother-in-law, now
husband, Livingston, she could not, "for one moment," en-
tertain.

Can a party, with due regard to the solemnity of an oath, be
permitted, in a court of justice, thus to shift his ground? Can
he, without explanation, whatever may be the actual truth, be
heard to say, that his own sworn statements were deliberately

Moore agt. Livingston and wife.

false, and on such falsity place his demand for judicial relief? I make these remarks with much reluctance ; and regret that I shall have occasion to repeat them in other parts of the extraordinary history which I am called upon to review.

Before the adoption of the new Code, the present suit would have been denominated a bill in equity—one of whose fundamental rules was, and still is, that a suitor, coming for relief, must come with clean hands. Does the plaintiff present himself in that attitude?

He asks the court not only to disbelieve his sworn statements in this suit, but (to preserve consistency in his new position) goes still further, and, in effect, demands that other sworn statements, made by him in another proceeding, before another officer, less than two weeks after the occurrence, and while the attending circumstances were of course fresh in his memory, should also be assumed to have been—for there would seem to be no other alternative—direct, deliberate perjury.

His new position on the trial—new as contradistinguished from the written complaint filed by him about five years ago, when this suit was commenced—is, that Miss Blackwell held the property in question not as an ordinary owner, from whom a purchase might naturally be made, but under a secret trust for his benefit, to protect him against inequitable creditors. He accordingly introduces a letter written, he says, by himself to her, on the 8th of October, 1851, the first line of which is in these words :—

"I write to request that you will return to me"—gratuitously, of course, he means—"my property, for which *you never paid one dollar.*"

And yet, on the 29th of November, 1844, only eighteen days after the execution of the instrument, by which he had put the property out of his hands, he had sworn, in substance, that the transaction was, in all respects *bona fide;* that it was absolute, and without any secret trust or understanding; and that the whole consideration, $11,000, the full value of the property, was actually paid. Here, then, we have, in effect, not only the implied averment in his complaint before this court, but the

express averment in his deposition before the surrogate, that he had made a real and not a mere sham transfer; that he had received a full and fair equivalent; and that the unsworn pretence to the contrary, set up in his letter, was entirely destitute of truth. In other words, we are called upon, at one and the same time, to believe that the original transaction was sham, and that it was real; that it was *bona fide*, and that it was fraudulent; that the alleged consideration money was paid and that it was not paid.

Nor does the difficulty stop with these averments: *acts* were done. Mr. Elias G. Drake, a stranger at the time to Dr. Moore, although a friend of Livingston's, was called in. The transfer to Miss Blackwell was made through him. He testifies that the alleged payment to Moore of the $10,650 actually was made; that Livingston, on behalf of the Blackwell family, furnished the means; that they consisted of checks and bank notes, which were handed over to Moore on the delivery of the papers; that Moore, Livingston, Drake and Rogers, the legal adviser, who prepared the papers, were all present; and what, if the affair was all unreal, seems still more extraordinary, that the rents were received, and were permitted quietly to be received, for years from that time forward, and new buildings, at an expense of many thousand dollars to be erected, by or on behalf of the Blackwell family.

All these acts, however minute, numerous, circumstantial and long continued as they are proved to have been, it is suggested were mere acting—the fruits of a fertile imagination and inventive genius—a skilful exercise of a kind of dramatic talent in combining a series of unreal elements to produce a real deception. Livingston and Moore, the chief performers, it is said, perfectly understood the plot, and each other. It was the creditors of Moore—the hard-hearted creditors, "without any equitable basis"—who alone were to be, and were deceived— and that rightfully. They were to be told, and to be made to believe—and the evidence shows (so perfect was the illusion) they actually did believe—that the performance was real; " that," (to use the language of Moore's affidavit,) " there was

Moore agt. Livingston and wife.

no understanding—not the least;" and that it would be a use-less effort, in a case attended and followed by so many indications of a genuine transaction, to attempt to impeach its *bona fides*. Willett did; he filed what was then called a creditor's bill; but, upon learning "*the facts*," he soon repented of what he had done, and discontinued.

There is a vague impression, nevertheless, it must be conceded, resulting from the whole evidence, and from several very significant omissions of evidence, that the transfer made by Moore, so far as he and Livingston were concerned, may have been a mere disguise. Why was the deed from Moore to Drake, who, as he swears, had no interest in the matter, immediately recorded, while that from Drake to Livingston's nominee, the real purchaser, if any existed, was kept from the public eye, unrecorded, for more than two years?

Perhaps it may be said—and that is the only explanation—that Livingston being known as the intimate of Moore, a deed to him, or a known member of his family, from Moore, might have excited suspicion in the minds of jealous creditors. But how are we to explain the entire omission to prove, or even attempt to prove, the sources of the consideration money. Ten thousand six hundred and fifty dollars in one sum is no inconsiderable amount. Whence was it derived? On what bank were the checks drawn? Five hundred dollars of the amount, a very small proportion of the whole, was no doubt paid in Livingston's check; but even that, there is good reason to believe, although not exactly technical proof, was drawn on a deposit of Moore's check upon another bank. But as to the remaining ten thousand, it is involved in total darkness. Miss Blackwell, whose name no doubt was merely used, kept no bank account; and Livingston's bank account shows no traces of any such sum, either in distinct and separate items, or in one amount. It does show, however, and it is a significant circumstance, that his balance at the time was only one thousand dollars, which was afterwards rapidly diminished, but never increased; and that he was in the regular habit of making his payments, however small, by checks, in several instances of a denomina-

tion as low as ten dollars. How is it possible, then, or rather, how is it at all probable, that the ten thousand dollar check, or checks, of which Mr. Drake speaks, and which he was made to believe in, were other than mere shams, handed, first with due formality, by Livingston to Moore, in the presence of witnesses, and then returned, without ceremony, by Moore to Livingston, as soon as the witnesses had retired? The cross-examination of Livingston, as a witness for the prosecution on the late criminal trial, could it be received as evidence to affect the interests of his now wife, would go far to strengthen the suspicions resulting from the entries in his bank account. That examination, however, although evidence against him, is by law no evidence against her. It may (as it undoubtedly has done) produce impressions more or less unfavorable, and of greater or less intensity : but they are impressions which, as this case presents itself, cannot be judicially acted on, unless it be first established that he, and not his now wife, is the real party in interest—a conclusion to which, as it seems to me, the evidence irresistibly tends.

Livingston, it will be recollected, married successively two sisters; the first named Justina, who died on the 11th of September, 1851, and the second named Eliza, with whom he intermarried two years after the commencement of this suit. Their property, which consisted of their shares of their parents' estate, amounting each to from fifteen to twenty thousand dollars, remained still in common, and was managed by an agent, Mr. Stephen C. Williams.

Miss Blackwell kept no bank account herself. Investments, therefore, of any consequence, especially an investment of upwards of $10,500 in a single purchase, on her behalf, would naturally, and I may almost say, inevitably, show themselves in the agent's accounts. As Mr. Williams, although he might have been, has not been examined, I must infer that his testimony, if given, would have proved no such payment. And no other source of supply being suggested, the conclusion must be that none existed, and consequently that no such payment, out of any funds of hers, was made : a conclusion which is fortified

Moore agt. Livingston and wife.

by the written order addressed by the first Mrs. Livingston to Mr. Drake, in which she speaks of this property as " the real estate you purchased in trust *for me*," and " which now stands in your name," and requests him to convey it to her " sister, Eliza B. Blackwell."

Should it be suggested that this order is not evidence against the second Mrs. Livingston, a ready answer is furnished by the memorandum at the foot of it, *signed by her*, in her then maiden name, in which, nine days after the date of the order, she says, " I hereby acknowledge the receipt of the deed for the above property,"—a deed, too, which, when produced, it is found recites a consideration of " one dollar."

It thus appears by the testimony of Drake, to whom Moore conveyed, that *he* had no interest in the purchase, so called; and from the acknowledgment of Miss Blackwell, to whom Drake conveyed, that *she* had none; and from the assertion of Livingston, implied by his handwriting in the body of both the order and receipt, that the purchase, if ever really made, was in trust for his first, and not his second wife.

Now, as there is no pretence that the first Mrs. Livingston paid anything—not even the formal acknowledgment of one dollar in the deed, for the deed was not to her, but to her sister— it seems manifest that the whole transaction was an affair of Livingston exclusively, in which the two ladies merely permitted their names to be used, in the full confidence that all was right.

. We come back, then, again to the inquiry—Was the transaction, as between Moore and Livingston, a reality or a sham? Livingston's bank acccount, in connection with Drake's testimony, standing unexplained, clearly proves that the checks used on the occasion were mere puppets, in a show got up to amuse and to blind the creditors of Moore. But were there any doubt on this point, the cross-examination of Livingston in the court of sessions, and which (if, as has been demonstrated, he be the real party) is admissible evidence, must be perfectly conclusive. In that, he says, the transaction on the part of Moore was " to protect himself from the sacrifice of that prop-

erty, he, Moore, being pressed by certain parties at the time, and he, Livingston, being prevailed upon by motives of friendship, "but against the advice of the moneyed adviser of his sister-in-law, at that time, and against his own better judgment and feelings, *to do that act* to oblige him." "What act?" was the natural inquiry; to which he responded, "To purchase that property." "Did *you* buy it?" "My sister—(meaning sister-in-law at that time)—bought it, but at my solicitation." "You procured her to become the purchaser?" "I did, sir. I furnished Drake with the money, and I know I got the deed." "Did you see Mr. Drake ever pay a cent of money to Dr. Moore?" "Yes, sir—(pause)—I do not know that I have. I gave Drake the money, $10,650, to pay for the property; the greater part in cash; and I think there was a check for $500." "Was the rest paid in bank notes?" "I will not answer such questions." After a lengthened sparring between the witness and the adverse counsel, he finally answered—"I think it was, sir." "Did you draw it from a bank?" "A part of it." "How much?" "I cannot recollect." "Did you keep a check-book at that time?" "I did." "Where is it?" "Destroyed." "Did you destroy it?" "I kept a marginal check-book, and after it was used it was destroyed." "When did you destroy it?" "I cannot tell you." "When did you last see it?" "I cannot tell you." "What bank did you draw *that* money from?" "I did not draw it from a bank. I do not recollect whether I drew it myself or not." "What bank did it come out of?" "I got part of the money from a gentleman." "What is his name?" "His name is Stephen C. Williams. Part was drawn from a bank. I do not recollect exactly about it." "Did you not say so just now?" "I believe a part was; but I am not sure." "Do you mean that you drew anything besides what was drawn upon the $500 check?" "I cannot recollect; but I think I did." "How much did you get from Stephen C. Williams?" "I do not recollect. The amounts were made up. Mr. Williams was the agent of the Blackwell estate, and had money in his hands belonging to that estate." "Was any part of it (the $10,-

650) your own money?"  "Some part of it was."  "How much?"  "I cannot tell till I look at the accounts."  "Who got Mr. Drake to lend his aid in the matter?"  "I did."

From this specimen of Livingston's testimony, taken from a larger mass, all tending to the same result, there cannot be a doubt, if we compare it with the proofs and omissions on the present trial, that he and Moore were the only real parties; that no money, in truth, was paid; and that the property was, in effect, placed under Livingston's control, and as a mere cover.

If the case rested here, whatever might be its moral merits, or its merits tested by the code of honor among men, in law it would admit of but one result. No man, creating a secret trust to defraud the law, can call upon the law to relieve him from the consequences of such misplaced confidence. His act is a misdemeanor—a misdemeanor not in himself only, but in "every person being a party to the conveyance," or "being privy to or knowing of it, who shall willingly put the same in use as having been made in good faith." (2 R. S. 690.) Yet the conveyance, as between the parties, is valid; and the title vests in the person named as alienee, subject only to the rights of creditors at the time. (1 R. S. 728.) It is void as against the creditors " hindered, delayed, or defrauded "—and as against them only. (2 R. S. 137.) As to the fraudulent grantor, he is estopped by his own act.

Sensible of this difficulty, the plaintiff, advised no doubt by his counsel, does not venture to ask the court to order a reconveyance to be executed to him, but simply to direct that a reconveyance, long since actually executed and delivered, the possession of which, mysteriously obtained, is fraudulently withheld, may be restored to him. In other words, he demands restitution of a title deed; which, if his allegations in that respect be well founded in fact, legally as well as justly belongs to him, and was in his lawful possession for eight months and upwards immediately after its execution.

The question, then, is, was there ever any such instrument in existence?

Moore agt. Livingston and wife.

I have already considered the probabilities of the case arising out of the strong presumption, under all the circumstances, that nothing was paid on the conveyance from Moore; that it was a gratuitous secret trust for his benefit, and that a gratuitous reconveyance, therefore, " as between friends," on demand, was very likely to be made. Still it might not have been. And the direct proofs of its alleged execution, it must be admitted, except as confirmed by the probabilities already adverted to, are not very strong. There is no allegation of any subscribing witness, and no probability of there having been one. But although the law, in conveyances of fee simple or freehold estates, ordinarily requires an attestation, it makes acknowledgment to a proper officer, duly certified by him, equivalent to a witness. (1 *R. S.* 738.) And in this case, if there was a deed there certainly was an acknowledgment. So that if it was executed at all, it was executed in due form. But the commissioner, although he recollects taking one acknowledgment of the party named, and may, as he says, have taken more, does not, after the lapse of so many years, remember the particular one in question. He *may*, therefore, have taken it; and his testimony is not inconsistent with that of the witnesses, who saw a paper purporting to be the deed in question with his certificate of acknowledgment indorsed upon it. But unfortunately only one of those witnesses was acquainted with the commissioner's handwriting, and he very slightly; and his scrutiny, if possible, was still slighter than his knowledge. The document was assumed at the time to be genuine, and was not examined with any view to that issue. Then, as to another witness who saw the deed, or rather, who saw a paper purporting to be the deed; he knew the hand, he says, of the party, although not that of the commissioner. But here again the witness's means of knowledge, admitting him to speak the truth, were very slender. And he, too, when the paper was exhibited to him by his brother, Dr. Moore, took it for granted that all was right, and of course did not scrutinize the signature. Such evidence of itself would not, it is obvious, be sufficient to divest a regular, formal paper title, accompanied and followed for years by actual possession and

receipt of the rents. To allow, in ordinary cases, such an effect to such evidence would, as the counsel for the defendant very properly urged, be dangerous in the extreme.

But this is not an ordinary case. As between Livingston and Moore, there was, I have shown, an implied promise, and a high moral and honorary obligation, to give such reconveyance. It was not for Livingston to vindicate the law. By his own showing, although *particeps criminis,* he was "the friend" of Moore. He had paid nothing, and was to pay nothing, for the property. It was a mere naked trust—fraudulent, it is true, as against the policy of the law, but certainly binding, in "friendship," as between persons equally guilty. The law was violated, but Livingston violated it as much and as knowingly as Moore. He should not, therefore, in a case of any doubt, be permitted to profit by the wrong. The law, under the circumstances, does not, as it certainly should not, accept his aid on such terms. Its dignity, in a doubtful case, will be better satisfied by restoring the property to its real, if not its technical owner, than by bestowing it as a reward for what cannot but be regarded as gross private treachery, unqualified by any pretence even of disinterested public service. Whatever may have been Moore's errors—and they can in no way be palliated, except under the suggestion put forth, not by his adversary's counsel, of a partial derangement, both moral and mental—whatever, I say, may have been his errors, it ill becomes Livingston, whose sins are the same, without the same palliation, to set them up as a barrier to the administration of justice towards his late friend and companion. All fair minded men must admit that very slight evidence should be accepted by the court as sufficient to remove such an obstruction. The substance is with Moore: the property was really his. Livingston was his confidential trustee, bound in honor to reconvey it to him whenever requested. He paid Moore nothing for it, and was expected to pay nothing. We may well presume, then, in favor of human virtue, that in a moment of just feeling he did execute, or, which is the same thing, procure to be executed, to Moore, the promised reconveyance, which one of the

witnesses says he, on a certain occasion, saw in Moore's hands, and which, as Moore swears, was afterwards, where it must still be presumed to be, in Livingston's : for on this point Moore's testimony is conclusive.  Although a party to the suit, the law, so far, allowed him to be a witness in his own favor; at the same time superadding, however, as a reasonable qualification, that if, as the statute expresses it, he availed himself of the privilege, " to prove by his own oath the loss of the instrument, in order to admit other proof of the contents," the adverse party, in that event, might also be examined on oath "to disprove such loss, and to account for such instrument." (2 *Rev. Stat.* 406; 1 *Hill,* 172; 2 *Seld.* 236.)  Moore swears he last saw the instrument in Livingston's hands.  Livingston, although permitted, does not venture to contradict him : he stands mute, as also his co-defendant.  Either, therefore, Livingston has the instrument still, and will not produce it, or he has lost it and cannot.  For, if it had never existed, he and his co-defendant could have said so ; and their oath would have countervailed the oath of the plaintiff.  It would most effectually have disproved and accounted for the alleged loss of the instrument, by showing that, in truth and in fact, it never had any existence to lose.  This silence at the trial, on the part of the defendants, is the more significant, when viewed in connection with Livingston's testimony on the late criminal charge made by Livingston against Moore in the sessions, and with the very peculiar composition of his co-defendant's answer to the civil complaint made by Moore against Livingston and wife in this court.  Both documents are characterized, seemingly, at least, by the most studied ambiguity.  In the one, when asked whether he ever saw a deed, signed by Miss Blackwell, " conveying that property back to Dr. Moore?" his reply was, " I have no recollection of any such deed."  Upon being further pressed with the question, " Will you swear you never saw it ?" he again responds, " I have no recollection : I swear that."  And when (urged still further, and probed, as it were, with the unfeeling instruments of legal surgery) he was asked, " Will you swear positively, as a matter of recollection, that you never saw

a deed, signed by Miss Blackwell, conveying back this property to Dr. Moore?" the only response that could be drawn from him was, "I will,—I do not think I ever saw it. I am positive I never saw it."

Such was the cross-examination, upon a different issue, and in a different court, as recently as last February. The pleading in this court was nearer to the date of the transaction. It was sworn, as the jurat shows, on the 5th of June, 1852, more than four years prior to the criminal trial, and bears strong indications of Livingston's supervision, if not dictation. As to the alleged reconveyance, instead of averring, as, if true, it naturally would have done, that no deed of any kind, or in any manner, was ever executed, the answer on this point contents itself with denying " that the indenture alleged in the complaint was so duly executed and acknowledged as is therein stated." Such a denial, although perhaps sufficient to raise an issue as matter of pleading, when considered as a sworn statement framed by able counsel for an intelligent client, can hardly be regarded in any other light than as a negative pregnant. If not a direct admission, it leads almost irresistibly to the conclusion that *some* deed was executed. And if the deed, so (almost confessedly) executed, was different from the plaintiff's description, why is it not produced, so that the court may see wherein the difference, if any, consists, and whether it be material or not? The plaintiff's oath, uncontradicted as testimony, conclusively shows that the instrument, whatever be its contents, was last seen in the possession of the adverse party; and due notice having been given to produce it on the trial, and its non-production being unaccounted for, it must be deemed to be there still? Its non-production, consequently, is an implied admission that the parol testimony, as to its purport, is substantially correct, and that an inspection of the paper itself, if produced, would not improve the defendants' case.

I must conclude, therefore, that a deed of reconveyance to Moore was actually executed and delivered; that, as a muniment of title, it lawfully became, and was his property; that the defendant subsequently, in some way unexplained, repos-

sessed himself of the instrument, and wrongfully withholds it; and that the plaintiff is entitled, lawfully, as well as justly, to a decree for its restitution, and for an account of the rents and profits from the 1st of July, 1851, up to which time it is conceded by the complaint there was a full and fair accounting, " to the entire satisfaction of the plaintiff."