# Keel *v.* Larkin.

*Bill in Equity by Judgment Creditor, to set aside Fraudulent Conveyances.*

1. *Fraudulent and voluntary conveyances; as between parties, and as against creditors.*—If a debtor buys a tract of land, paying the purchase-money, and taking the title in the name of another person, with the fraudulent intent to place it beyond the reach of his creditors, the land becomes liable to the debts of the fraudulent grantee, and can not be placed beyond the reach of his creditors by a subsequent voluntary conveyance to his fraudulent grantor; but, if he has become surety for his fraudulent grantor, on a note given in renewal or extension of one of his pre-existing debts, on which separate actions are instituted against them, and afterwards re-conveys the land by voluntary conveyance to his principal, who resides on it at the time, in order that the latter may assert a claim of homestead exemption against the judgment, such re-conveyance is fraudulent in fact, and the claim of exemption can not prevail.

[Keel v. Larkin.]

2. *Same; conveyance to wife of fraudulent debtor.*—If the original debtor, having thus obtained a conveyance from his fraudulent grantee and surety, conveys a part of the land in trust for his wife, in consideration of her release of dower in other lands, the conveyance will be sustained as against the judgment creditor, when it appears that the wife did not participate in the fraudulent intent of her husband, and had no knowledge of his indebtedness.

3. *Election between action at law and suit in equity.*—When a creditor has obtained separate judgments against his debtor and the debtor's surety, he may maintain an action at law to subject a tract of land as the property of the principal, and at the same time a bill in equity to subject it as the property of the surety; and though he can have but one satisfaction of his debt, he can not be required to elect between the two suits.

APPEAL from the Chancery Court of Jackson.

Heard before the Hon. S. K. McSPADDEN.

The bill in this case was filed on the 7th September, 1883, by William R. Larkin, as a judgment creditor of Lemuel H. Lewis, against the said Lewis, and against the personal representative, widow and children of Lemuel G. Mead, deceased; and sought, principally, to subject to the satisfaction of complainant's said judgment a tract of land, called the "Outerbridge tract," which Lewis had conveyed to Mead in his life-time, in alleged fraud of his creditors.

The complainant's judgment against Lewis was rendered on the 8th March, 1879, and was founded on two bonds, or promissory notes under seal, executed by him and said Mead jointly; and the complainant had obtained a judgment against Mead on these notes, on the 26th October, 1877. Executions on each of these judgments had been regularly issued, and returned "No property found;" and after the death of Mead, on the 14th January, 1878, an execution against him having been levied on the land, a claim of exemption was interposed by his widow and children. The notes, on which these two judgments were rendered, were signed by Lewis as the surety of Mead; and they were given in settlement and extension of a former debt of Mead, on which a suit in chancery was then pending. The tract of land, which contained two hundred acres, was conveyed to Lewis by J. C. Outerbridge and wife, by deed dated October 27th, 1873, on the recited consideration of $4,000 in hand paid; but the bill alleged that the purchase-money was in fact paid by said Mead, who was then indebted to complainant, and that the title was taken in the name of Lewis, who was his nephew, with the fraudulent intent to place it beyond the reach of his own creditors, and especially of the complainant, whose original debt had then accrued. The tract

of land was conveyed by Lewis to Mead, by deed dated May 28th, 1875, which recited the payment of $3,000 as its consideration; but the bill alleged that no consideration was paid, and that the conveyance was executed with the fraudulent intent to place the property beyond the reach of the complainant as a creditor of Lewis, and to enable Mead, who resided with his family on the land, to claim a homestead exemption as against the complainant's judgment. On the 26th March, 1876, Mead conveyed forty acres of the tract, with about ninety acres of another tract, to said Lemuel H. Lewis, in trust for Mrs. Mary F. Mead, the wife of the grantor, on the consideration, as recited, of her relinquishment of dower in two other tracts of land, which said Mead had sold and conveyed to W. M. Maples and J. E. Daniel, respectively; and the bill sought to set aside this deed also, on the ground that it was without consideration, and was executed with the fraudulent intent on the part of Mead of reducing the Outerbridge tract, or homestead tract, so that the residue (one hundred and sixty acres) might be claimed as a homestead exemption. After the death of Mead, his estate having been declared insolvent, his widow and children claimed an exemption in the homestead tract, which does not seem to have been contested in the Probate Court; and an execution on complainant's judgment against him having also been levied on the land, they filed a claim of homestead exemption in the Circuit Court, which was contested by the complainant.

On a hearing on demurrers interposed by the guardian *ad litem* of the infant defendants, Hon. N. S. GRAHAM presiding, some of the grounds of demurrer were sustained, and others overruled; and on appeal to this court, errors being assigned by each party, the decree was affirmed on the assignments of error by the defendants, but reversed on the assignment of errors by the complainant. After the reversal, the cause being submitted for final decree on pleadings and proof, the chancellor rendered a decree for the complainant, declaring the conveyance from Lewis to Mead, and the subsequent conveyance by Mead to Lewis in trust for Mrs. Mead (now Mrs. Keel), fraudulent and void as against the complainant's judgment against Lewis, and condemning the entire tract to the satisfaction of said judgment. This decree is now assigned as error by the defendants, separate assignments of error being made by Mrs. Keel and the infant children.

[Keel v. Larkin.]

D. D. SHELBY, for the appellants.

R. C. BRICKELL, and J. E. BROWN, *contra.*

STONE, C. J.—When this case was before us at a former term (*Larkin v. Mead*, 77 Ala. 485), we passed only on the equity of the bill, and held it made a case for equitable relief. In that case, the question was raised on demurrer, and only the averments of the bill could be considered. Taking the averments to be true, we held that Mead, and those claiming in his right, were estopped from setting up any title, legal or equitable, in him, Mead, at the time he induced Larkin to accept Lewis as surety. Our ruling was rested on the averments, that "Mead induced Larkin to dismiss his suit to subject the proceeds of the life-policy, and to extend time of payment on his notes or bonds, with Lewis as surety, . . . on the representation that Lewis held a fee-simple title to the lands."

The case comes before us now on pleadings and testimony, and on the chancellor's final ruling thereon. The answers deny the averments of the bill on which its equity was rested at the former hearing, and there is not a semblance of testimony offered in support of those averments. We must, therefore, determine this case on the other questions raised.

We hold that the testimony authorizes us to draw the following conclusions of fact: That Mead purchased the Outerbridge tract of land—the land in controversy—and paid for it with his own means, and took the title in the name of Lewis, with the intent of fraudulently placing it beyond the reach of his creditors generally, and particularly to hinder and defeat any attempt the present complainant might make to subject it to the demand set up in the bill; that Lewis accepted and held the title in secret trust for the benefit of Mead, to aid him in consummating his fraudulent design; and that when, in the changed conditions, it became unsafe for the title to remain in Lewis, it was voluntarily re-transferred to Mead, who had greater facilities for further covering it beyond the pursuit of creditors, and with the intent that he should do so. We speak of Mead's intent; for we are convinced that Lewis had neither interest nor intent, further than to aid Mead in carrying his fraudulent purposes into execution.

It is contended for appellants, that when Lewis transferred

the title of the land to Mead, he only placed it in him who had paid the purchase-money, thus executing the trust which had been reposed in him; and that such conveyance can not be a fraud on the creditors of Lewis, no matter what his motive may have been; that the land, *ex æquo et bono*, belonged to Mead, and it can not be a fraud to place the title where it rightfully should be; that the land, so far as creditors are concerned, has all the while belonged to Mead, and the conveyance only made visible that which already existed, though secretly.

There are authorities which seem to maintain this proposition.—*Clark v. Rucker*, 7 B. Monroe, 583; *Davis v. Graves*, 29 Barb. 480; *Cramer v. Blood*, 57 Barb. 155; s. c., 48 N. Y. 684. And the following authorities, it is contended, go far to support the same principle: *Caffal v. Hale*, 49 Iowa, 53; *Clemens v. Clemens*, 28 Wis. 637; s. c., 9 Amer. Rep. 520; *Parker v. Tiffany*, 52 Ill. 286; *Matthews v. Buck*, 43 Me. 263; *M. Sav. Bank v. Lyle*, 7 Lea, 431; *Petty v. Petty*, 31 N. J. Eq. 8; *Moore v. Livingston*, 14 How. Pr. 1; Wait Fraud. Con. § 398. In none of these cases, however, was the question of actual, intentional fraud in the reconveyance either proved, or relied on. In the present case, as we have stated, we are satisfied that, in the original placing of the title in Lewis, and in the re-transfer to Mead, the purpose and intent were to defraud Larkin, and to hinder him in the collection of the debt this bill seeks to enforce. In reaching this conclusion, we are influenced by the clearly proven motive and intent of Mead, and the further manifest fact that Lewis was simply his instrument, without interest, and without independent motive.

· When the title to the land was placed in Lewis, under the circumstances, and with the intent shown above, the fact that Mead had negotiated the purchase, and made the payment, gave him no right, either in law or equity, to recover the lands from Lewis. Concurring, as they did, in the fraudulent intent, the law denies to each all redress as to any mere executory agreement. It leaves the title where they placed it, and lets them severely alone. *In pari delicto, melior est conditio possidentis.* The law withholds its hand, not in furtherance of any claim the grantee may assert, but as a punishment of the bad motive of him who invokes its aid. *Ex turpi causa, non oritur actio.* Nor does such fraudulent grantee rest under a moral obligation to restore the property. If there be no obligation which is recognized and acted on,

it is simply conventional; for moral obligation can not be predicated of such iniquitous transaction. The foregoing reflections have reference to any contention which might arise between Mead and Lewis, and any right which either of them could assert, growing out of the several transactions.

There is another aspect of this question. When Mead purchased the land, and had the title placed in Lewis, Mead's creditors had a clear right, in equity, to have it declared his property, and to have it sold in payment of his debts. So, the title remaining in Lewis, his creditors had a clear right, as against him and Mead, to have the property sold in payment of his, Lewis' debts. Suppose the creditors of Mead instituted proceedings to condemn the land as his property, and the creditors of Lewis made a similar attempt to condemn it as his property; which class should prevail over the other? This question seems to have arisen in *M. Savings Bank v. Lyle*, 7 Lea (Tenn.), 431, and the ruling was, that the creditors of the fraudulent grantor should be first paid. That question does not arise in this case, for there are here no conflicting claims of opposing creditors. The debt sought to be enforced in this suit, is equally the debt of Mead and Lewis, and the question as to which of two creditors shall have the preference does not arise.

When the renewal notes were executed, and as long as the title remained in Lewis, there can be no question that the land was subject to the debt, either as the property of Mead or of Lewis, at the option and pleasure of Larkin, the creditor. Of Mead, because he purchased and paid for it, and had the title put in Lewis, as a means of defrauding his creditors. Of Lewis, because he owed the debt, the title was in him, and its liability to his debts could not, as a punishment for Mead's fraud, be gainsaid by the latter.

It is contended for appellants, that inasmuch as Mead and Lewis are alike bound for the debt this bill seeks to enforce, there can be no fraud in transferring the title from the latter to the former, because in either holding the property remains alike liable for one and the same debt. On this ground, it is claimed that the intent to delay, hinder, or defraud can not be predicated of the facts connected with the retransfer.

If the adventitious surroundings of the two parties were similar, this position would seem to be impregnable. But they were not similar. Mead was a married man, and had his residence on the land. Lewis was unmarried, and did not reside on the lands. Mead could claim homestead ex-

[Keel v. Larkin.]

emption, which Lewis could not do. Mead, having a wife, with inchoate right of dower in her, could and did make that inchoate right a basis of negotiation and contract, by which he secured to her a valuable interest in the land, which incidentally enured to his enjoyment and benefit. This, Lewis could not have done. The facts and circumstances convince us that the whole purpose of this reconveyance was to enable Mead, on the very plan that he carried out, to place the property in controversy where he and his family could enjoy it, and Larkin could not make it subject to his claim. The title left in Lewis, he could not occomplish this result, nor cover the property beyond Larkin's reach. This presents all the elements of actual fraud. In the case of *Chapin v. Pease*, 10 Conn. 69, Moses Pease, being embarrassed, conveyed the land in controversy to Barnabas Pease, without consideration, and with intent to delay and hinder his creditors. The title remained in Barnabas eleven years, during which time he contracted debts, and was on the verge of insolvency. Moses Pease having disembarrassed himself, Barnabas reconveyed the land to him without consideration, and became insolvent. A creditor of Barnabas, whose claim accrued while the title was in the latter, had the land levied on as the property of Barnabas, and Chapin claimed under the right thus acquired. The principal question was the validity of the reconveyance from Barnabas to Moses Pease. The court said: "The conveyance from the defendant (Moses Pease) to Barnabas Pease, being intended to defraud the creditors of the former, was void as to them, but good as between the parties. Neither at law, nor in chancery, could Barnabas Pease be compelled to reconvey. As between the parties, the conveyance stood on the same ground as if a full and adequate consideration had been paid. . . . . . . As against everybody, then, but the creditors of his grantor, Barnabas Pease had a valid title. The recorded title was in him; and for a period of eleven years, and up to the time of his insolvency, he was held out to the world as the owner of the property. Under these circumstances, the conveyance from Barnabas to Moses Pease, being voluntary, was fraudulent and void as to the creditors of the former."

The case of *Allison v. Hagan*, 12 Nev. 38, is not distinguishable from the present one in principle. Mrs. Hagan, being embarrassed, conveyed her property—real estate—to Kerrin, upon no consideration, and with the fraudulent intent of delaying and hindering her creditors, until she could raise

[Keel v. Larkin.]

money and discharge her debts, when Kerrin was to reconvey to her. Kerrin became indebted while the title was in him. He subsequently conveyed to Young, without consideration, to be held by him for Mrs. Hagan's benefit. Young reconveyed to Mrs. Hagan. An effort was made to subject the property to Kerrin's debt, and Mrs. Hagan resisted it, on the title which had revested in her under Young's reconveyance. An offer was made in the trial court to prove by Mrs. Hagan that the title had passed out of her, and again revested in her, by voluntary conveyances, with the intent and understanding stated above. This testimony was ruled out, and the land held subject to Kerrin's debt. The ruling of the lower court was affirmed in the Supreme Court, in a well reasoned and instructive opinion. Among many other well expressed reasons for its ruling, the revising court said:

"From the offered testimony, Kerrin was not a trustee in any proper sense, but he was a fraudulent grantee as against the creditors of appellant (Mrs. Hagan), and Kerrin took the whole title of appellant in favor of his creditors. Appellant's creditors could have defeated the conveyance upon the ground of want of consideration, or on the ground of fraud; but neither Kerrin nor appellant could do so, as against Kerrin's creditors.  . . .

"Appellant contends that the offered testimony would have shown, or tended to show, that Kerrin never had any estate . . . which in equity ought to have been subjected to the claims of his creditors, but that he was, on the contrary, bound to preserve the property for her, and that his deed to Young, and Young's deed to appellant, only resulted in an honest discharge of his obligation on Kerrin's part, and an execution of the trust. From the proposed testimony there can be no doubt that Kerrin and appellant conspired together to delay the creditors of appellant. The law declares such conduct an offense against good morals, common honesty, and sound public policy.

"The law does not teach that an agreement entered into for the purpose of delaying or defrauding creditors of the vendor, can be upheld or encouraged by declaring it a trust, nor will courts sustain it as such."

So, in Bump Fraud. Con. (3d Ed.), 443, it is said: "The principle that a collusive contract binds the parties to it, is a simple principle which commends itself no less to the moralist than to the jurist, for there is no obligation upon any one to extricate a rogue from his own toils. On any other

principle a knave might gain, but could not lose by a dishonest expedient; and inducements would be furnished to unfair dealings, if the law were to repair the accidents of an unsuccessful trick. A fraudulent grantee, therefore, is allowed to retain the property, not for any merit of his own, but for the demerit of his confederate, in accordance with a wise and liberal policy, which requires that the consequences of a fraudulent experiment shall be made as disastrous as possible. The law endeavors to environ a debtor with all possible perils, and make it appear that honesty is the best policy."

We hold that the conveyance from Lewis to Mead was inoperative and fraudulent, and vested no title in Mead against the creditors of Lewis; nor in any one else whose claim rested alone on the sufficiency of Mead's title, with nothing else to aid it.

The renewal notes or bonds, given by Mead & Lewis, bear date in December, 1874. The conveyance of the land from Lewis to Mead was in May, 1875. In March, 1876, Mead conveyed 135 acres of the land back to Lewis as trustee, to be held for the sole and separate use of Mary F. Mead, wife of Mead, the grantor. This deed recites as its consideration and inducement that Mead owned and had contracted to sell two tracts of land; one in Madison county containing 125 acres, the other in Jackson county, containing 200 acres; that his wife, Mary F., refused to join in the conveyance, or relinquish her dower rights in said lands, without compensation therefor, and that to induce her to unite in the conveyance, he, Mead, executed the said deed to Lewis, in trust for her.

The bill charges that Mead induced his wife to interpose this objection to the execution of the deed; that the lands, to the conveyance of which he pretended he had been forced to purchase her assent, were of inconsiderable value, and were incumbered to their full value; and that this, too, was done to place the property, so settled, beyond the reach of Larkin, and fraudulently to secure it for the use of Mead's family, himself included. Issue was formed on this feature of the bill, and Mrs. Mead, now Keel, denied all knowledge that her husband owed any debt whatever. The answers fully cast on complainant the burden of proving the foregoing charge. No testimony whatever was offered by complainant, bearing on this feature of the bill, while the defendant made proof tending to show that the settlement

[Keel v. Larkin.]

was not an unreasonable compensation for the right Mrs. Mead surrendered. Under these circumstances, we feel constrained to hold that Mrs. Mead was a purchaser for a valuable consideration; and there is no proof that she had notice of the fraud, under which Mead acquired title to the land, nor of any fact or circumstance calculated to put her on inquiry. The settlement of the one hundred and thirty-five acres for her benefit must stand.—*Hoot v. Sorrel*, 11 Ala. 386; *Bailey v. Litten*, 52 Ala. 282.

As to the remaining land, outside of the settlement for the benefit of Mrs. Mead, it is subject to Lewis' debt, and against such liability, neither Mead, if living, nor any one standing in his right, can successfully claim homestead exemption. So far as the rights of the parties to this suit are concerned, it is Lewis' property, not Mead's.

In the suit at law, the attempt is to subject the land as Mead's. The present suit proceeds against it as the property of Lewis. Of course both can not succeed, and one of the suits ought to be abandoned. It is not a case, however, where the plaintiff or claimant should be forced to elect in which court he will proceed.—Rule of Practice 113. The suit at law, and the bill in chancery, are not instituted for the same claim, as the law understands that phrase.

The decree of the chancellor is reversed, and a decree here rendered, declaring that the land conveyed to Lewis, for the use and benefit of Mrs. Mead, now Keel, is not subject to complainant's claim, and as to that part of the land the bill is dismissed. As to the residue of the land, the complainant is entitled to relief. The register will report to the next term of the Chancery Court the amount due complainant on the judgment against Lewis, with interest computed to the coming in of the report; and to this end he will consider the testimony on file, and any other lawful testimony that may be offered. All other questions are reserved for decision by the chancellor.

Reversed and rendered.